IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 14, 2009

## STATE OF TENNESSEE v. CHANCELLER CHATMAN

Direct Appeal from the Criminal Court for Shelby County
No. 03-04435     W. Fred Axley, Judge

No. W2008-00568-CCA-R3-CD  -  Filed June 26, 2009

The defendant, Chanceller Chatman, was convicted by a Shelby County Criminal Court jury of one count of felony murder, one count of especially aggravated robbery, and four counts of aggravated robbery. He was sentenced to life imprisonment for the felony murder conviction, fifteen years for the especially aggravated robbery conviction, eight years each for two of the aggravated robbery convictions, and twelve years each for the remaining aggravated robbery convictions. The trial court ordered that the life sentence for felony murder and the fifteen-year especially aggravated robbery sentence be served concurrently to each other. The court further ordered that the aggravated robbery sentences be served consecutively to each other and consecutively to the life plus fifteen-year sentence, for an effective sentence of life plus forty years. On appeal, the defendant challenges the sufficiency of the evidence in support of his felony murder conviction and the trial court's imposition of consecutive sentences. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Robert Brooks (on appeal) and Edwin C. Lenow (at trial), Memphis, Tennessee, for the appellant, Chanceller Chatman.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Goodman and Tracye Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the defendant's participation with Deonte McBee in a September 19, 2002, armed robbery in a Memphis home that resulted in the shooting death of one victim, James Ryan Hale. The defendant, who was indicted with McBee on one count of felony murder, one count of especially aggravated robbery, and four counts of aggravated robbery, was tried alone on the charges from October 3-6, 2005.

Phyllis Hale, the mother of the murder victim, testified that the last time she saw her son, a traveling tattoo artist, was on his twenty-fourth birthday, September 18, 2002. She said she learned the next day that he had been shot and killed in a robbery.

Tammy Hughes testified that on the night of September 18, 2002, she went to 3430 Kirby, the home of Walter Lane and Bobby Strickland, to visit Lane and to see Hale. Lane, Strickland, Hale and Anthony Hill were at the residence when she arrived, and Hale was in the process of giving Strickland a tattoo. Sometime after 9:00 p.m., she was receiving a tattoo from Hale in the dining room of the residence when she heard a loud bang, turned, and saw two men, whom she later identified as the defendant and McBee, enter the residence armed with pistols. The first man told the victims that they knew what time it was, which Hughes explained was street terminology meaning that they were about to be robbed. The men made everyone go into the living room, demanded money, and had them empty their pockets. The men then wanted to know where the guns were kept and forced the victims to remove their clothes when they told them that they had no guns.

Hughes testified that the men fired a warning shot into the floor at Hill's feet because he would not stop talking. The defendant then began searching the house, taking Strickland with him into one of the back rooms, while McBee remained in the living room with his gun pointed at the other victims. Hughes next heard a commotion from the back room, followed by the sound of a gunshot, and saw McBee grab his stomach and lean forward as he began yelling that he had been shot. McBee then fired his pistol at the victims in the living room, in the process hitting both Lane and Hughes. At that point, the defendant came out of the back room and both he and McBee fired multiple gunshots at the victims in the living room as they backed out of the house together.

Hughes testified that she and Hale ran to the kitchen, where Hale fell to the floor and she noticed for the first time that he had been shot as well. She said he was covered in so much blood that she could not tell where he was injured. He could not speak, and she held his hand and tried to stay low to avoid the flying bullets. Later, she ran back into the living room, retrieved her cell phone, and called 911. She said she was shot in the right shoulder and was outside the trauma center of the hospital talking to a police detective when she saw McBee being wheeled past her on a stretcher. He gave her a threatening look, but after he had been wheeled past her, Hughes informed the detective that he was one of the shooters. Hughes testified that she later identified both McBee and the defendant from six-person photographic arrays she was shown by the police. She also positively identified the defendant in the courtroom.

Walter Lane testified that he had a criminal record that included "a few felonies" and was currently incarcerated. On the night of September 18, 2002, he was at the home he shared with his brother, Bobby Strickland, while Ryan Hale gave him, his brother, Tammy Hughes, and Anthony Hill tattoos. Hale was working on Hughes's tattoo at approximately 1:00 or 1:15 a.m. when the

defendant and McBee, both of whom Lane knew from the neighborhood, came to the door and knocked. Strickland let them in, and McBee, using profanity and brandishing a .40 caliber Glock pistol, told the victims that they knew what time it was. He then forced everyone to one spot in the living room, while the defendant, who was also armed with a .40 caliber Glock pistol, began searching the house asking where the money was.

Lane testified that he and the other victims pulled their money out of their pockets and that the defendant gathered most of it before he left the house. At some point, McBee told everyone to take off their clothes and they all stripped naked, with the exception of Lane, who kept his boxer shorts on. At another point, McBee fired a gunshot into the floor at Hill's feet, telling the victims that he was not "playing" with them. The defendant then took Strickland into a back room where a locked safe was located. A few seconds later, Lane heard a gun discharge and saw McBee, who had been by the front doorway, fall toward the ground. McBee yelled that they were shooting and began firing his pistol at the victims in the living room. Lane, who was shot in the left arm, began running toward the back room to check on his brother. As he did so, the defendant ran past him, stopped to help McBee up, and continued with McBee out of the house. At that point, both the defendant and McBee started shooting back into the house. Lane testified:

> [The defendant] come -- you know, we run past each other. . . . He grabbed like helping [McBee] up off the ground. And, you know, by then, they outside the house on -- in the front yard right there and they start shooting back in the house and so I had to crawl on the ground and shut the wood door.

Lane testified that after the defendant and McBee left, he ran next-door to his mother's house to tell her he had been shot and then returned home, where he found Hale, who was bleeding profusely, lying on the kitchen floor. Lane said he later positively identified the defendant and McBee from photographic lineups he was shown by the police. He also made a positive courtroom identification of the defendant. On cross-examination, he denied having known that McBee's purpose in coming to his house was to deliver cocaine or that his brother had kept .357 Magnum bullets on top of his bedroom chest of drawers. He acknowledged that he had been convicted of a number of felonies, including convicted felon in possession of a handgun, reckless endangerment with a deadly weapon, evading arrest, possession of a controlled substance with the intent to manufacture, deliver or sell, burglary, and two counts of forgery.

Anthony Hill testified that he had been convicted of a number of felonies, including several drug offenses, and in September 2002 was selling drugs to make money. On the evening of September 18, 2002, he, Bobby Strickland, Walter Lane, Ryan Hale, Tammy Hughes, and two other women were at Strickland and Lane's home, where Hale was giving tattoos.[1] During that time, Hill

---

[1]Hill's testimony with the respect to the number of women in the home at the time of the robbery was confusing. During direct examination, he testified that those present in the home at the time of the robbery were himself, Hale, Strickland, Lane, and two females whose names he could not recall. On cross-examination he testified that there were two women, in addition to Hughes, present in the home, but then agreed with defense counsel that it made a total of six people present. On redirect examination, he clarified that there were seven people present: himself, Strickland,
(continued...)

called McBee and asked him to deliver fourteen grams of crack and powder cocaine to the house for Hill to purchase. McBee and the defendant arrived at the house approximately thirty or forty minutes later, and Hill was pointing out Hughes's tattoo to McBee when he realized that both McBee and the defendant had guns drawn on him. Hill said that McBee told him to "drop it off, you know what this is." He, therefore, took the $740 in cash he had in his pocket and threw it on the table. McBee then ordered everyone to remove their clothes and, when Hill hesitated, said, "[Y]ou think I'm playing[?]" and fired a shot in the floor near Hill's feet.

Next, the defendant grabbed Strickland and took him to the back room, asking him where "the dope" was. Hill said that the next thing he heard was the defendant say, "[Y]ou think I'm playing?" followed by a gunshot. Three or four seconds later, McBee, who had been standing by the front door, began firing his pistol at the group in the living room. Everyone dropped to the ground while McBee, still shooting, walked out of the house. The defendant came out of the back room and left the house, and Hill heard McBee tell him that he had been shot. Hill testified that McBee fired more shots from the outside into the house, but he did not hear the defendant fire anything other than the one shot from the back room.

Hill testified that he was not hit but knew that Lane, Hughes, and Hale had been shot. He said he fled the scene after checking briefly on the condition of his friend, Lane, because he had a pending case and feared he would be taken to jail if the police found him at the house. However, he later met with the police and positively identified the defendant and McBee from photographic lineups. He also made a positive identification of the defendant in the courtroom. On cross-examination, he acknowledged that he had received probation in the drug case that had been pending at the time of the robbery, but denied that it had been negotiated in exchange for his testimony in the instant case.

Officer Meiangelo Taylor of the Memphis Police Department, one of the first two patrol officers to respond to the scene, testified that there were three gunshot victims in the house, including a white male lying on the kitchen floor who appeared to be seriously injured. Officer David Galloway, a crime scene investigator with the Memphis Police Department, identified various photographs of the crime scene, including ones that showed .40 caliber shell casings and bullet holes both inside and outside of the residence.

Dr. Karen Chancellor, the Chief Medical Examiner for Memphis and Shelby County, testified that the cause of death for Ryan Hale was a gunshot wound in which the bullet entered at his left jaw, traversed his neck, damaging the subclavian artery and vein, and lodged in the right lung, causing hemorrhaging inside his body. She said that the toxicology report was positive for the presence of alcohol in his system but negative for drugs.

Lieutenant Frank Bell of the Memphis Police Department testified that he responded to a reported shooting at the Wingood Manor Apartments shortly after 1:19 a.m. on September 19, 2002.

---

[1](...continued)
Lane, Hale, Hughes, and the two other women.

When he arrived, he found McBee with a gunshot wound to the lower abdomen sitting in the passenger seat of a Nissan Maxima and the defendant standing beside the vehicle. He said that the defendant told him that McBee's name was "Shawn Jackson" and reported that he and McBee had just been the victims of an attempted carjacking.

Sergeant Christopher Joyner of the Memphis Police Department, who also responded to the reported shooting at the Wingood Manor Apartments, testified that the defendant initially told them that he and McBee had been the victims of an attempted robbery but then said that McBee had accidentally shot himself while putting his pistol in his pants.

Sergeant Jerry Collard of the Memphis Police Department testified that he was interviewing Tammy Hughes in the hallway outside the trauma unit of the hospital when the victim from the Wingood Manor Apartments shooting was wheeled past. Hughes began to cry, and when he asked her why, she told him that he was one of the two gunmen from the Kirby residence robbery.

Following deliberations, the jury convicted the defendant of the indicted offenses. At the conclusion of the sentencing hearing, the trial court sentenced the defendant to life imprisonment for the felony murder conviction and as a Range I, standard offender to fifteen years for the especially aggravated robbery of Ryan Hale, twelve years for the aggravated robbery of Walter Lane, twelve years for the aggravated robbery of Tammy Hughes, eight years for the aggravated robbery of Anthony Hill, and eight years for the aggravated robbery of Bobby Strickland. Finding the defendant to be a dangerous offender, the trial court ordered that the four aggravated robbery sentences be served consecutively to each other and consecutively to the concurrent life plus fifteen-year sentences for the felony murder and especially aggravated robbery convictions, for an effective sentence of life plus forty years in the Department of Correction.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant states his first issue as follows:

> Whether the evidence was sufficient to sustain the defendant's conviction for felony murder, and whether the felony murder statute is fundamentally unfair and violates due process by permitting a conviction upon a finding of the mental element of murder by proof of intent to commit the underlying felony.

The defendant concentrates his argument on the inherent unfairness of the felony murder statute, submitting that, despite the fact that our supreme court has repeatedly upheld its constitutionality, "Tennessee's felony murder statute should be judicially abolished as it presently stands." We note, however, that the defendant neither filed a pretrial challenge to the constitutionality of the statute nor raised its constitutionality as an issue in his motion for a new trial. As such, the issue regarding the constitutionality of the statute is waived. See Tenn. R. App. P. 3(e); Tenn. R. Crim. P. 12(b); State v. Rhoden, 739 S.W.2d 6, 10 (Tenn. Crim. App. 1987); State v. Farmer, 675 S.W.2d 212, 214 (Tenn. Crim. App. 1984). Thus, the only issues before us are whether

the evidence was sufficient to sustain the felony murder conviction and whether the trial court erred by imposing consecutive sentencing.

When the sufficiency of the convicting evidence is challenged on appeal, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of the first degree felony murder of Hale during the perpetration of a robbery. First degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (2006). The mental state required for conviction of felony murder is the intent to commit the underlying offense. Id. § 39-13-202(b). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. 39-13-401(a).

The defendant essentially concedes that the State established his participation in the robbery that led to Hale's death, but argues that it "failed to prove that he acted with malice or intent to kill Hale." However, despite the defendant's unhappiness with the law, our felony murder statute requires only that the State prove the intent to commit the underlying felony, and not that the defendant acted with malice toward the victim or any intent to cause his death. Proof of the intent

to commit the underlying felony is a question of fact to be decided by the jury after consideration of all the facts and circumstances of the case. State v. Buggs, 995 S.W.2d 102, 107 (Tenn. 1999).

Viewed in the light most favorable to the State, the evidence established that the defendant and McBee entered the Kirby residence armed with pistols and demanded and took money from those present. The evidence further established that they fired multiple gunshots at the assembled victims during the course of the robbery and that one of those bullets struck Hale in the jaw, causing his death. This evidence was more than sufficient for a rational trier of fact to find the defendant guilty of murder during the perpetration of robbery beyond a reasonable doubt. We conclude, therefore, that the evidence was sufficient to sustain the felony murder conviction.

## II. Consecutive Sentencing

The defendant next contends that the trial court erred by imposing consecutive sentencing on the basis of his status as a dangerous offender without making adequate findings of fact in support of such sentencing, as required by State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). He concedes that the trial court checked the appropriate boxes on the written "Sentencing Findings of Fact" that it entered in the case, but argues that "language of a form cannot substitute for the trial court's duty to make the specific findings required by Wilkerson." The State contends that the record supports the imposition of consecutive sentencing under the dangerous offender criterion and that the trial court made sufficient findings in support of its decision. We agree with the State.

Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of a number of criteria applies, including that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4) (2006). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); Wilkerson, 905 S.W.2d at 937-38.

The trial court made the following oral findings of fact when imposing consecutive sentencing at the November 16, 2005, sentencing hearing:

> Now, J[ames] Ryan H[ale] is the deceased. [The defendant] will be sentenced as a range I standard offender and he does have a previous history of criminal convictions, criminal behavior.
>
> Being a leader in the commission of the offense is more of a facilitation. There were several victims and obviously he had no hesitation in committing this offense where the risk to human life was great.

-7-

He is a dangerous offender. The offense, itself, even without the pistol, is aggravated. The sentences are not probatable, because of the range, they're "B" felonies, except for the especially aggravated robbery.

That same day, the trial court entered its written "Sentencing Findings of Fact" in which it found:

The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; and all three of the following factors apply:

(a) the circumstances surrounding the commission of the offense are aggravated,

(b) confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to lead a productive life and the defendant's resort to criminal activity in furtherance of an anti-societal lifestyle, and

(c) the aggregate length of the sentences reasonably relates to the offense of which the defendant stands convicted.

Although we agree that the trial court could have been more thorough in its oral findings of fact, we conclude that the combination of oral and written findings was sufficient to justify its imposition of consecutive sentencing under the dangerous offender criterion of the statute. See State v. Robert Rubin, No. W2007-00907-CCA-R3-CD, 2008 WL 2687705, at *8 (Tenn. Crim. App. July 8, 2008) (upholding imposition of consecutive sentencing based on defendant's classification as a dangerous offender in case where trial court's oral findings of fact were supplemented by written findings of fact identical to those found in this case). We further conclude that the record supports the trial court's determination that consecutive sentencing was appropriate in this case. The defendant and his codefendant entered a home armed with pistols, robbed everyone present, and then opened fire as they were leaving, wounding two victims and killing a third. These actions, in our view, clearly demonstrate that the defendant is a dangerous offender with little or no regard for human life and no hesitation about committing a crime in which the risk to life is high and that his effective sentence was necessary to protect the public from his further criminal behavior and reasonably related to the severity of his offenses. We conclude, therefore, that the trial court did not err in imposing consecutive sentences.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

-8-